**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

|   |   |   |
|---|---|---|
| | ) | |
| BRIGGS & STRATTON CORP.; | ) | |
| BRIGGS & STRATTON POWER | ) | |
| PRODUCTS GROUP, LLC, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 5:13-CV-316 (LEK/ATB) |
| | ) | |
| CHONGQING RATO POWER CO., LTD; | ) | |
| RATO NORTH AMERICA; DENVER | ) | |
| GLOBAL PRODUCTS, INC., | ) | |
| | ) | |
| Defendants. | ) | |

_____ )

## <u>PLAINTIFFS' OPENING CLAIM CONSTRUCTION BRIEF</u>

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................. iii

PRELIMINARY STATEMENT ....................................................................................... 1

BACKGROUND ............................................................................................................. 1

PRINCIPLES OF CLAIM CONSTRUCTION ............................................................... 3

ARGUMENT ................................................................................................................... 4

I.     DISPUTED CLAIM TERMS OF THE '678 PATENT ................................... 4

     A.     "main frame" ................................................................................. 4

     B.     "providing a main frame with a cutter deck" and "coupling the cutter deck to the main frame" ....................................................................... 7

          1.     "providing a main frame with a cutter deck" ................... 7

          2.     "coupling the cutter deck to the main frame" .................. 10

          3.     RATO Fails to Show Indefiniteness ............................... 11

     C.     "coupling" .................................................................................... 12

     D.     "load compensation adjuster" ...................................................... 12

     E.     "each independent suspension and wheel is movable vertically up and down relative to the main frame, respectively against and with force exerted by the spring and by the load compensation adjuster when compressed" ................................................................................. 14

     F.     "positioning the spring of each independent suspension to bias a respective wheel of the two wheels in a downward direction, the spring having a range of compression between uncompressed and fully compressed states" ....... 15

     G.     "positioning the load compensation adjuster . . . inside a respective spring" ....... 16

II.    DISPUTED CLAIM TERMS OF THE '746 PATENT ................................... 17

     A.     "a mower" / "a method of assembling a mower" ................................ 17

     B.     "central longitudinal beam" ......................................................... 19

     C.     "substantially parallel" ................................................................ 21

     D.     "pivotably coupled to the at least one central longitudinal beam" ...................... 22

E.     "laterally spaced from the longitudinal axis between about 0% and about 20% of the track width" ............................................................................ 23

F.     "first and second transverse portions" ................................................. 24

G.     "longitudinal portion" ........................................................................ 24

CONCLUSION ............................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Adams Respiratory Therapeutics, Inc. v. Perrigo Co.,*
    616 F.3d 1283 (Fed.Cir.2010)......................................................................10

*Anchor Wall Sys. v. Rockwood Retaining Walls, Inc.,*
    340 F.3d 1298 (Fed. Cir. 2003).................................................................3, 22

*Andersen Corp. v. Fiber Composites, LLC,*
    474 F.3d 1361 (Fed. Cir. 2007).....................................................................9

*Bicon, Inc. v. Straumann Co.,*
    441 F.3d 945 (Fed. Cir. 2006).................................................................12, 24

*Bradford Co. v. Conteyor N. Am., Inc.,*
    603 F.3d 1262 (Fed. Cir. 2010)....................................................................10

*Cacace v. Meyer Mktg. (Macau Commercial Offshore) Co., Ltd.,*
    812 F. Supp. 2d 547 (S.D.N.Y. 2011)...........................................................7

*Comair Rotron, Inc. v. Nippon Densan Corp.,*
    154 F. Supp. 2d 326 (D. Conn. 2001)..........................................................22

*Cordis Corp. v. Medtronic AVE, Inc.,*
    339 F.3d 1352 (Fed. Cir. 2003).....................................................................22

*Deere & Co. v. Bush Hog, LLC,*
    703 F.3d 1349 (Fed. Cir. 2012).....................................................................18

*Digital Biometrics, Inc. v. Indentix, Inc.,*
    149 F.3d 1335 (Fed. Cir. 1998)......................................................................3

*Dow Chem. Co. v. Sumitomo Chem. Co.,*
    257 F.3d 1364 (Fed.Cir.2001).......................................................................10

*Ecolab, Inc. v. Envirochem, Inc.,*
    264 F.3d 1358 (Fed. Cir. 2001).....................................................................22

*Energy Transp. Grp., Inc. v. William Dament Holding A.S.,*
    697 F.3d 1342 (Fed. Cir. 2012).................................................................4, 6

*Epistar Corp. v. ITC,*
    566 F.3d 1321 (Fed. Cir. 2009)......................................................................4

*Exxon Research & Eng'g Co. v. United States,*
    265 F.3d 1371 (Fed. Cir. 2001).................................................................6, 13

*Frank's Casing Crew & Rental Tools, Inc. v. Tesco Corp.*,
No. 2-07-cv-015 (TJW), 2008 WL 4900137 (E.D. Tex. Nov. 12, 2008) ...............................11

*Hypoxico, Inc. v. Colo. Altitude Training, LLC*,
No. 02-CV-6191, 2008 WL 4129269 (S.D.N.Y. Sept. 4, 2008)....................................................7

*In re Omeprazole Patent Litig.*,
222 F. Supp. 2d 423 (S.D.N.Y. 2002).......................................................................................14

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys.*,
381 F.3d 1111 (Fed. Cir. 2004)............................................................................................4, 11

*Intellectual Prop. Dev., Inc. v. UA-Columbia Cablevision of Westchester, Inc.*,
336 F.3d 1308 (Fed. Cir. 2003)....................................................................................................7

*Microprocessor Enhancement Corp. v. Texas Instruments, Inc.*,
520 F.3d 1367 (Fed. Cir. 2008)....................................................................................................6

*Microsoft Corp. v. Multi-Tech. Sys., Inc.*,
357 F.3d 1340 (Fed. Cir. 2004)....................................................................................................9

*Newriver, Inc. v. Mobular Techs., Inc.*,
478 F. Supp. 2d 158 (D. Mass. 2007) ..........................................................................................5

*Ossur HF v. iWalk, Inc.*,
Civ. No. 12-11061-FDS, 2013 WL 4046709 (D. Mass. Aug. 8, 2013)........................................7

*Parker-Hannifin Corp. v. Baldwin Filters, Inc.*,
No. 1:07-cv-1709, 2008 WL 5732941 (N.D. Ohio July 3, 2008)..............................................11

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) (*en banc*) ........................................................3, 4, 5, 8, 10

*Pickholtz v. Rainbow Techs., Inc.*,
284 F.3d 1365 (Fed. Cir. 2002).................................................................................................12

*Playtex Prods., Inc. v. Proctor & Gamble Co.*,
400 F.3d 901 (Fed. Cir. 2005).....................................................................................................22

*Power Mosfet Techs., L.L.C. v. Siemens AG*,
378 F.3d 1396 (Fed. Cir. 2004).................................................................................................12

*Proveris Scientific Corp. v. Innovasystems, Inc.*,
Nos. 2013-1166 *et al.*, 2014 WL 104025 (Fed. Cir. Jan. 13, 2014) .......................................18

*Telemac Cellular Corp. v. Topp Telecom, Inc.*,
247 F.3d 1316 (Fed. Cir. 2001).................................................................................................14

*Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp.*,
    587 F.3d 1339 (Fed. Cir. 2009)...................................................................................................3

## PRELIMINARY STATEMENT

Plaintiffs Briggs & Stratton, Inc. and Briggs & Stratton Power Products Group, LLC (collectively "Briggs") proposed constructions follow basic principles of claim construction, applying each term's plain meaning consistent with the specification, file history, and understanding of a person of ordinary skill in the art.  RATO, by contrast, at a loss to explain its clear infringement of the claims, argues instead that most of the well-understood claim terms are indefinite.  Because the claims can be construed and understood, they are not indefinite.  As to its alternative constructions, RATO repeatedly attempts to import limitations from the specification (or from thin air) into the claims.  These additional, unrecited limitations are contrary to the plain and ordinary meaning of key terms and not supported by the intrinsic evidence.  Briggs therefore respectfully requests that the Court adopt its proposed construction of the disputed claim terms.

## BACKGROUND

U.S. Patent No. 6,510,678 ("the '678 patent"), issued on January 28, 2003, is directed to independent suspension systems for lawnmowers that incorporate a "load compensation adjuster."  (Dkt. No. 85 Ex. A ['678 patent] at col. 2:46-50.)  At the time of invention, its innovative design of an independent suspension with a load compensation adjuster (which prevents bottoming out of the springs used in the suspension) solved the previously intractable problem of prior art independent suspension systems in the field of lawnmowers that often "bottomed out," causing rider discomfort, coil bind, and uneven grass cuts.  (*Id.* col. 2:31-40.)  The '678 patent claims and discloses a remedy for these problems—use of a self-adjusting load compensation adjuster to improve comfort for the rider and prevent coil bind.  The '678 patent specification discloses several preferred embodiments of load compensation adjusters including an "overload spring," "shock absorber," "air shock," and "airbag."  (*Id.* col. 6:29-7:29, Figs. 11-16.)  Each of these load compensation adjusters are used in the claimed invention to help create a

1

lawnmower "suspension that works effectively with a wide range of weight variations." (*Id*. col. 2:39-40.)

Each asserted claim of the '678 patent claims an "independent suspension system having a spring and a load compensation adjuster wherein each independent suspension and wheel is movable vertically up and down relative to the main frame, respectively against and with force exerted by the spring and by the load compensation adjuster when compressed." (*Id*. col. 11:28-34.)  The load compensation adjuster must be positioned and adjusted such that it "prevent[s] full compression of the spring." (*Id.* col. 12:1.)  The load compensation adjuster, moreover, must be at least partially within the spring of the suspension, such that it prevents full compression of the spring (and prevents spring bind and bottoming out).

U.S. Patent No. 7,107,746 ("the '746 patent") was issued on Sep. 19, 2006.  Briggs has asserted claims 1-6 (apparatus claims) and 10-12 (method of assembly claims).  Claims 2-6 are dependent on independent claim 1 and claims 11 and 12 are dependent on independent claim 10. (Dkt. No. 85 Ex. B ['746 patent] col. 35:53-37:12.)  The preamble of each claim of the '746 patent states that it is directed towards a mower or lawnmower.  Claim 1 describes a patented mower comprising, *inter alia*, a "central longitudinal beam" that is "substantially parallel" with the longitudinal axis of the mower (a line passing from the front to the rear of the mower). (*Id*. col. 35:53-36:7.)  The '746 patent claims also include two wheels with independent suspension that are particularly spaced to define the track width of the mower, (*id*. col. 4:38-41), and coupled to the "at least one central longitudinal beam" of the mower via a connection with longitudinal pivot axes. (*E.g.*, *id*. col. 35:63-36:7.)

The claims of the '746 patent were largely unchanged during prosecution.  A December 7, 2005 non-final rejection and response provided clarifying amendments and explanations for

the invention claimed in the '746 patent.  In his non-final rejection, the examiner found that the patent was in the field of "mowing machine[s]" and relied on two patents, U.S. Patent No. 3,719,371 ("Musgrave") and U.S. Patent No. 3,792,748 ("Regier"), to preliminary reject claims as anticipated and/or obvious.  (Dkt. No. 85 Ex. G at 4-6.)  In support of rejection, the examiner specifically found that Musgrave disclosed the "at least one longitudinal beam" that had been claimed in the '746 patent application.  (*Id*. at 4.)  In response, Briggs amended its claim from "at least one longitudinal beam" to "at least one central longitudinal beam."  (*Id*. Ex. H at 7-9.) Shortly thereafter, the patent was granted and subsequently published on September 19, 2006.

## PRINCIPLES OF CLAIM CONSTRUCTION

It is a bedrock principle of patent law that claims of a patent define the scope of a patented invention.  *See, e.g.*, *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (*en banc*).  Accordingly, "a claim construction analysis [begins] by considering the language of the claims themselves."  *Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp.*, 587 F.3d 1339, 1346-47 (Fed. Cir. 2009); *see, e.g.*, *Digital Biometrics, Inc. v. Indentix, Inc.*, 149 F.3d 1335, 1344 (Fed. Cir. 1998) (describing the "hierarchy of analytical tools" for claim interpretation). The words set forth in a claim should generally be "deemed to have their ordinary and customary meaning in their normal usage in the field of the invention."  *Anchor Wall Sys. v. Rockwood Retaining Walls, Inc.*, 340 F.3d 1298, 1306 (Fed. Cir. 2003).  When considering the meaning of claim terms to the ordinary artisan who has read the entire patent, *Phillips*, 415 F.3d at 1321, "the context in which a term is used in the asserted claim can be highly instructive."  *Id*. at 1314; *see also id.* at 1314-15 (explaining that differences among claims can be a useful guide in understanding the meaning of particular terms).  In cases where the ordinary meaning of claim language is readily apparent, claim construction involves little more than applying the widely accepted meaning of commonly used words.  *Id*. at 1321.

3

In *Energy Transp. Grp., Inc. v. William Dament Holding A.S.,* 697 F.3d 1342, 1349-50 (Fed. Cir. 2012), the Federal Circuit adopted the plain meaning of a claim term because the specification did not clearly provide for a narrower construction.  *Id.* ("the specification gives no reason to construe the claims to require that an external computer calculate the values programmed into the filter").  The court relied upon *Innova/Pure Water, Inc. v. Safari Water Filtration Sys.,* 381 F.3d 1111, 1117 (Fed. Cir. 2004), where it had previously held that "claims will not be read restrictively unless the patentee has demonstrated *a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction*."  (Emphasis added) (Internal quotation marks and citation omitted).  "A heavy presumption [exists] that claim terms carry their full ordinary and customary meaning, unless it can show the patentee expressly relinquished claim scope. "  *Epistar Corp. v. ITC,* 566 F.3d 1321, 1334 (Fed. Cir. 2009).

Beyond the patent's specification, the Court should also consult the prosecution history.  *Phillips*, 415 F.3d at 1317.  However, "because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes."  *Id.*  The Court may also look to "expert and inventor testimony, dictionaries, and learned treatises."  *Id.* (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995) (*en banc*)).  Such evidence, however, is "in general . . . less reliable than the patent and its prosecution history."  *Id.* at 1318.

## ARGUMENT

### I.      DISPUTED CLAIM TERMS OF THE '678 PATENT

#### A.      "main frame"

The term "main frame" appears in all asserted claims.  Both parties agree that the term includes a "primary load bearing structure."  The dispute here relates to RATO's attempt to

improperly import from the specification a negative limitation distinguishing a "subframe" from "a main frame." *Phillips*, 415 F.3d at 1328.

The ordinary meaning of the terms "main" and "frame" is "readily apparent" from the asserted claim language, and thus does not require any special construction. *Id*. at 1314; *see, e.g.*, *Newriver, Inc. v. Mobular Techs., Inc.*, 478 F. Supp. 2d 158, 162 (D. Mass. 2007) ("[W]here the claim language is clear, no further construction is necessary."). When discussing a piece of machinery, such as a lawnmower, the standard definition of a "frame" is a "a rigid structure formed of joined pieces and used as a major support . . . ." (*See* Ex. 1 [Random House Webster's College Dict.] at 4 (emphasis added).)[1] The ordinary and customary meaning of the word "main," moreover, is "primary," and, as an adjective, simply serves to clarify that the "main" frame is the "'primary' load bearing structure" of the lawnmower. (*See id*. Ex. 2 [Merriam-Webster Dict.] at 2; Ex. 3 [Am. Heritage Dict.] at 3.)

The specification of the '678 patent provides no reason to alter the ordinary meaning of the term "main frame." The specification describes using a "main frame" as a primary load bearing structure that transfers the weight of the vehicle and cutter deck to the wheels. (*See, e.g.*, '678 patent col. 4:7-26, col. 5:8-24; Fig. 2 (element 16).) The specification clarifies that the "main frame" design need not be a single longitudinal member or beam, but a structure that includes multiple constituent elements. (*Id*. Fig. 6 (disclosing a "main frame" (16) comprising a lower (76) and upper (74) member joined by two struts (78)).) There is no intrinsic evidence that limits the ordinary meaning of the term "main frame" in the claims.

---

[1] "Ex." refers to the exhibits attached to the Declaration of Amy L. DeWitt in Support of Plaintiffs' Opening Claim Construction brief, submitted concurrently.

RATO does not dispute the commonly understood meaning of the term "main frame." Instead, to purportedly justify narrowing its construction, RATO relies on a single embodiment in the specification that references a "pivoting subframe." (*See id*. col. 7:62-64.)  There is no basis for limiting the claim to exclude such a subframe.  Where, as here, a plain meaning of a term is reasonably apparent, the Federal Circuit has found it improper to depart from that understanding absent a clear intrinsic justification for a narrower construction.  *See, e.g.*, *Energy Transp. Grp., Inc.*, 697 F.3d at 1348-49 (citing *Innova/Pure Water, Inc.*, 381 F.3d at 1117).

Moreover, even if RATO were correct that the cited language could be used to limit the claim (it is not), it does not support excluding all "subframes" from the definition of a "main frame" – as only "*pivoting* subframes" are described in the specification.  ('678 patent col. 7:62-64 (emphasis added).)  Instead, it would only be appropriate to exclude "pivoting subframes" from the construction of "main frame."  RATO's construction carves out a broader limitation of the term "main frame" than is contemplated by *any* embodiment disclosed in the specification.

RATO finally argues that all asserted claims that contain the term "main frame" are indefinite.  A claim is only indefinite if it cannot be construed, *i.e.*, if "the meaning of the claim is discernible, even though the task may be formidable and the conclusion may be one over which reasonable persons will disagree," then the claim is *not* indefinite.  *Exxon Research & Eng'g Co. v. United States*, 265 F.3d 1371, 1375 (Fed. Cir. 2001); *Microprocessor Enhancement Corp. v. Texas Instruments, Inc.*, 520 F.3d 1367, 1374 (Fed. Cir. 2008) (holding claim indefinite only when "insolubly ambiguous, and no narrowing construction can properly be adopted.").[2]  In its Joint Claim Construction Statement, beyond unsubstantiated attorney argument, RATO fails

---

[2]  RATO bears the heavy burden of overcoming the patent's presumed validity through "clear and convincing evidence" of indefiniteness.  *Intellectual Prop. Dev., Inc. v. UA-Columbia Cablevision of Westchester, Inc.*, 336 F.3d 1308, 1319 (Fed. Cir. 2003).

to submit any evidence to support its conclusory allegation that all claims containing the term "main frame" are indefinite.  (Dkt. No. 81-1 at 2.)  Such unexplained, bald assertions are insufficient to satisfy RATO's burden of proving indefiniteness by clear and convincing evidence.  *See, e.g.*, *Ossur HF v. iWalk, Inc.*, Civ. No. 12-11061-FDS, 2013 WL 4046709, at *25 (D. Mass. Aug. 8, 2013) ("[A]ttorney argument, without more, is generally not considered clear and convincing evidence sufficient to overcome the presumption of validity."); *Cacace v. Meyer Mktg. (Macau Commercial Offshore) Co., Ltd.*, 812 F. Supp. 2d 547, 559-560 (S.D.N.Y. 2011) (mere attorney argument insufficient to prove that one skilled in the art would be unable to discern meaning); *Hypoxico, Inc. v. Colo. Altitude Training, LLC,* No. 02-CV-6191, 2008 WL 4129269, at *10 (S.D.N.Y. Sept. 4, 2008) (same).  Accordingly, because, as discussed above, the claim term "main frame" can easily be construed and RATO falls far short of providing clear and convincing evidence to the contrary, RATO's indefiniteness challenge should be rejected.

**B.**     **"providing a main frame with a cutter deck" and "coupling the cutter deck to the main frame"**

RATO contends that the elements "providing a main frame with a cutter deck" and "coupling the cutter deck to the main frame" of method claim 34 are indefinite.  (Dkt. No. 81-1 at 3.)  In the alternative, RATO proposes constructions for each term that are purportedly exclusive of any corresponding construction for the other element.  By contrast, Briggs proposes distinct constructions for each element that are mutually compatible and predicated on the ordinary meaning of the claim terms in light of the intrinsic evidence.  Moreover, RATO's objection to the redundancy of Briggs' constructions is not necessarily incorrect, but irrelevant.

**1.**     **"providing a main frame with a cutter deck"**

Briggs proposes that the limitation "providing a main frame with a cutter deck" should be construed to mean "providing a main frame and a cutter deck under the main frame."  RATO

contends that the entire phrase should be interpreted as a "main frame" structure that "includes a cutter deck."  Briggs' construction should be adopted because it is the only proposal that reflects the plain and ordinary meaning of the terms in light of the intrinsic evidence.

Any English speaker recognizes that the term "providing," when used in connection with tangible items, ordinarily and customarily means supplying or making that item available.[3]  *See, e.g.*, *Phillips*, 415 F.3d at 1312-13 (when claim language has a well-understood, unambiguous meaning, that meaning governs).  The specification of the '678 patent makes clear that the limitation requires the provision of a main frame and a cutter deck under the main frame.  *See, e.g.*, *id.* at 1315 ("Usually, [the specification] is dispositive; it is the single best guide to the meaning of a disputed term.").  Each and every embodiment in the specification shows a main frame and a cutter deck under the main frame.  (*See, e.g.*, '678 patent col. 1:39-46, col. 2:57-62, col. 4:14-27, col. 5:8-16, col. 5:25-31, col. 7:62-8:33, Figs. 1, 2, 5, 20.)  The Background of the Invention discloses a preferred version of the patented riding lawn mower wherein "a mower deck [is] mounted at the underside of the machine."  (*Id.* col. 1:39-46.)  The detailed description of the invention subsequently describes an embodiment where a floating cutter deck is "suspended beneath the main frame" by front and rear suspension chains.  (*Id.* col. 4:14-27.)  Another preferred embodiment discloses a lawn mower wherein a cutter deck is connected to the underside of a mower frame via suspension struts.  (*Id.* col. 5:8-16, col. 5:25-31.)  Another embodiment discloses a dual approach, whereby the front of the cutter deck is attached via chains and a cutter deck lift assembly to the main frame.  (*Id.* col. 7:62-8:33, Fig. 1 ("cutter deck" beneath "main frame" (20)), Figs. 2, 5 (same), Fig. 6 (same at 122 and 150 respectively).)

---

[3] As an illustration, any English speaker would understand that the phrase "Jon provided food and shelter to Bill" to mean that "Jon supplied or made available food and shelter to Bill."

Beyond the express embodiments, the specification contains statements directed to the invention as a whole that confirm Briggs' proposed construction.  *See, e.g.*, *Andersen Corp. v. Fiber Composites, LLC*, 474 F.3d 1361, 1367-68 (Fed. Cir. 2007) (using specification to narrow claim where statements "are characterizations directed to the invention as a whole"); *Microsoft Corp. v. Multi-Tech. Sys., Inc.*, 357 F.3d 1340, 1348 (Fed. Cir. 2004) (claim language may be limited by statements in specification where they "are not limited to describing a preferred embodiment, but more broadly describe the overall inventions of all three patents").  The invention of the '678 patent is directed to solving a problem that is caused by stationing a cutter deck under a main frame.  In its Background section, the '678 patent details how independent suspension systems, such as the claimed invention here, seek to generally address the longstanding problems of scalping and uneven cut height by decoupling the movement of a lawnmower's frame from the height of the cutter deck relative to the earth surface—a complex solution to a problem that only exists when the cutter deck is under the main frame.  ('678 patent col. 1:50-2:30.)  Throughout the specification, the '678 patent emphasizes how the claimed suspension systems ensure the vertical movement of the main frame does not cause scalping by the cutter deck underneath it.  (*E.g.*, *id*. col. 2:50-67, col. 4:14-27, col. 4:56-67, col. 8:22-33.)

By contrast, the specification provides no support for RATO's proposal to interpret the term "providing a main frame with a cutter deck" as a main frame that "includes a cutter deck." Indeed, no such embodiment is disclosed in the specification.  Consistent with longstanding Federal Circuit precedent, the Court should not construe the claims in a manner that excludes ***all*** the embodiments of the specification.  *See, e.g.*, *Adams Respiratory Therapeutics, Inc. v. Perrigo Co.*, 616 F.3d 1283, 1290 (Fed.Cir.2010) ("A claim construction that excludes the preferred embodiment 'is rarely, if ever, correct and would require highly persuasive evidentiary

support.'") (quoting *Vitronics Corp. v. Conceptronics, Inc.*, 90 F.3d 1576, 1583-84 (Fed. Cir. 1996)); *Dow Chem. Co. v. Sumitomo Chem. Co.*, 257 F.3d 1364, 1378 (Fed.Cir.2001) ("[I]t is unlikely that an inventor would define the invention in a way that excluded the preferred embodiment . . . .") (internal quotations and citation omitted).

### 2. "coupling the cutter deck to the main frame"

While the prior claim term addresses how the main frame and cutter deck are provided, the term "coupling the cutter deck to the main frame" addresses how they are joined. The plain and ordinary meaning of this term is apparent and should control. RATO, however, proposes that the term "coupling the cutter deck to the main frame" should be interpreted to mean "[t]he cutter deck is connected directly to the main frame rather than to a structure on the 'wheel side' of the suspension." RATO's construction is far narrower than the claim term's plain meaning and also unsupported with the intrinsic record.

The meaning of "coupling the cutter deck to the main frame" is "readily apparent" from common usage of the words. *Phillips*, 415 F.3d at 1314 ("application of the widely accepted meaning of commonly understood words."). The Federal Circuit has already found that the plain meaning of "coupling" is "linked together, connected or joined." *See, e.g.*, *Bradford Co. v. Conteyor N. Am., Inc.*, 603 F.3d 1262, 1265 (Fed. Cir. 2010). This is consistent with contemporaneous dictionary definitions. (*See* Ex. 4 [Webster's New World College Dict.] at 3; *see also id.* Ex. 1 at 3 (defining "couple" to mean "to join; connect"); Ex. 3 (defining "couple" to mean "to link together; connect") at 1.) Contrary to RATO's suggestion, nothing in the ordinary meaning of this term requires a "direct" connection. In fact, the specification provides for indirect connection between the frame and the cutter deck. (*See, e.g.*, '678 patent col. 5:8-16, col. 5:25-31 (discussing Figs. 3-5).) For example, in Figure 1, the main frame is connected to the cutter deck via front and rear suspension chains. (*Id.* col. 4:14-27.)

RATO's proposed construction is neither tethered to this limitation's commonly understood meaning or to any language in the specification limiting or restricting the use of such ordinary meaning in the claims. RATO cites to only one embodiment in which one end of the cutter deck is directly connected to the frame. (*Id*. col. 8:22-33.) The other end of the cutter deck, however, is indirectly connected to the frame via intermediate members. (*Id*.) Thus, not only is RATO's description of the embodiment incorrect, the specification's description of a single, exemplary embodiment does not justifying narrowing "coupling" to direct coupling. *See, e.g.*, *Innova/Pure Water, Inc.*, 381 F.3d at 1117 (finding it improper to depart from that understanding absent a clear intrinsic justification for a narrower construction). Indeed, courts have often been reluctant to exclude indirect connections absent clear intrinsic justification. *See, e.g.*, *Frank's Casing Crew & Rental Tools, Inc. v. Tesco Corp.*, No. 2-07-cv-015 (TJW), 2008 WL 4900137, at *7 (E.D. Tex. Nov. 12, 2008) ("Only where the context of the claim or prosecution history has precluded the possibility of indirect connections has the Federal Circuit narrowed the construction of 'connected' to require a direct connection"); *Parker-Hannifin Corp. v. Baldwin Filters, Inc.*, No. 1:07-cv-1709, 2008 WL 5732941, at *11 (N.D. Ohio July 3, 2008) (intrinsic evidence does not compel a construction that would exclude an indirect attachment).

### 3.      RATO Fails to Show Indefiniteness

RATO alleges that the terms "providing a main frame with a cutter deck" and "coupling the cutter deck to the main frame" are indefinite because Briggs accuses the same step in the manufacture of the RAVEN as satisfying both limitations. (Dkt. No. 81-1 at 3.) RATO's efforts to conflate these separate claim elements is unavailing. As discussed above, the "providing" limitation addresses the orientation of the main frame and the cutter deck, while the "coupling" limitation address how they are connected – each claim term has a distinct meaning. However, even assuming *arguendo* that the two claim terms are redundant (they are not), this would ***not***

11

mean the claim is indefinite. *See Power Mosfet Techs., L.L.C. v. Siemens AG*, 378 F.3d 1396, 1410 (Fed. Cir. 2004) ("[W]hile interpretations that render some portion of the claim language superfluous are disfavored, where neither the plain meaning nor the patent itself commands a difference in scope between two terms, they may be construed identically."); *Pickholtz v. Rainbow Techs., Inc.*, 284 F.3d 1365, 1373 (Fed. Cir. 2002) (construing two terms as synonyms; "the patent in this case provides no indication that the two terms mean different things").

### C.      "coupling"

The term "coupling" should be construed according to its ordinary meaning of linking together, connecting or joining.  (*See, supra*, § I.B.2.)  RATO's attempt to limit "coupling" to only "direct" connections is improper.  (*Id.*)

### D.      "load compensation adjuster"

The load compensation adjuster ("LCA"), by its own words, is adjustable to compensate for loads of differing weights.  RATO contends that even though the LCA is an "adjuster," it need not be adjustable.  RATO also contends that the LCA must "carry part of the weight placed on the main frame," even though this is not required in the claims or the specification.

The claim term "load compensation adjuster" is an "adjuster" and, therefore, is adjustable. *See Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006) ("[C]laims are interpreted with an eye toward giving effect to all terms in the claim.") (citations omitted).  The specification lists four preferred embodiments of a LCA when used with a spring, all of which are adjustable (*see* '678 patent col. 6:29-7:29):

- "Overload Spring 100:" As detailed by suspension expert Tim Hicks, "[a] person of ordinary skill in the suspension art would, upon looking at the specification of the '678 patent, immediately see that ['nut 98'] can and would be used with ['overload spring 100'] for adjustability."  (Dkt. No. 85 Ex. N [Hicks Decl.] ¶ 14; *see* '678 patent col. 6:29-51, Figs. 11-13.)  Further, "[a] person of ordinary skill in the suspension art would know that these components together form a 'load compensation adjuster' because they are adjustable to compensate for load changes."  (Dkt. No. 85 Ex. N ¶ 14.)

- "Shock Absorber 102:" The specification describes "shock absorber 102" as creating a "coil-over suspension." ('678 patent col. 7:8-12, Fig. 14; *see* Dkt. No. 85 Ex. N ¶ 16.) "A person of ordinary skill in the suspension art would have immediately recognized upon reviewing the specification that this arrangement [] could be adjusted in a number of ways, including modifying the overall length of the shock absorber, its dampening characteristics, and/or the compression of the spring via adjustments to the shock casing." (Dkt. No. 85 Ex. N ¶ 16.) RATO's expert also admitted at deposition that a "coil-over suspension" refers to an adjustable component. (*See, e.g.*, Ex. 5 [Radcliffe Depo. Tr.] at 138:13-24 (comparing to Savory suspension), *id.* at 104:18-106:4, 112:11-8 (discussing Savory).)

- "Air Shock 104:" "[A]ir shock 104 allows adjustment of the spring tension by raising or lowering the air pressure via a port 105, thereby determining the spring load or tension." ('678 patent col. 7:19-21.)

- "Airbag 106:" "Airbag 106 can be inflated or deflated for the desired suspension via a port 107, either by the user or pre-inflated at the factory." (*Id.* col. 7:28-30.)

RATO's proposed construction is contrary to the intrinsic evidence. The specification describes "overload spring 100" – an example of an LCA – as being "one inch shorter in length than spring 72." (*Id.* col. 6:44-45.) This allows "spring 72 to operate at its existing rate, but when spring 72 is compressed more than one inch, overload spring 100 begins to help carry the extra weight." (*Id.* col. 6:45-49.) The overload spring thus does not carry any weight unless the suspension is compressed more than one inch, and RATO's proposed construction would exclude the overload spring embodiment.

RATO's assertion that "load compensation adjuster " is indefinite fails because its meaning "is discernible." *Exxon Research*, 265 F.3d at 1375. RATO's expert declaration provides only a conclusory sentence asserting that the claim is indefinite and lacks an established meaning. (Ex. 6 [Radcliffe Decl. dated Dec. 16, 2013] at 3.) This bald assertion is insufficient to satisfy RATO's burden of proving indefiniteness by clear and convincing evidence. *See, e.g.*, *In re Omeprazole Patent Litig.*, 222 F. Supp. 2d 423, 570 (S.D.N.Y. 2002) (finding mere conclusory statements by expert fails to provide clear and convincing evidence of invalidity); *see also Telemac Cellular Corp. v. Topp Telecom, Inc.,* 247 F.3d 1316, 1329 (Fed. Cir. 2001)

("Broad conclusory statements offered by [one party's] experts are not evidence.")  As explained above, RATO cannot meets its heavy burden here because this term is discernible based on the clear disclosures in the intrinsic evidence.

      **E.**    **"each independent suspension and wheel is movable vertically up and down relative to the main frame, respectively against and with force exerted by the spring and by the load compensation adjuster when compressed"**

The parties agree that "each independent suspension and wheel" moves vertically up and down relative to the main frame.  The parties disagree over whether the phrase "force exerted by the spring and by the load compensation adjuster when compressed" refers to a single force or to separate forces.  The plain meaning of the claim term is clear and should govern.  (*See* '678 patent col. 11:30-36.)  Contrary to RATO's suggestion, there is no ambiguity as to the term "respectively."  That word separates the phrase "up and down" from the phrase "against and with."  Accordingly, the wheel moves up against the force and down with the force.

The phrase "force exerted by the spring and by the load compensation adjuster when compressed" by its terms refers to a single force.  The word "force" in the claims is singular, not plural.  RATO's assertion that the claim contemplates one force from the spring and a separate force from the LCA is not supported by the claim language.  In light of RATO's assertion, Briggs suggests that the "force" in the claim is the "combined force" of the spring and the LCA acting on the wheel.  Briggs does not intend to limit the claim by adding the word "combined"; rather, the word is necessary to clarify the term's plain meaning in view of RATO's position.

Briggs' construction is supported by the specification.  With respect to the "overload spring 100," when the wheel moves up, both the spring and the "overload spring 100" will compress, thus exerting a ***combined*** force that acts ***against*** the movement of the wheel.  (*See* '678 patent col. 6:29-50.)  When the wheel moves back down, the compressed spring and

14

"overload spring 100" will exert a ***combined*** force that acts ***with*** the movement of the wheel. The same actions occur with any of the other LCA embodiments described in the specification.

RATO's construction is inconsistent with other embodiments of the '678 patent. For instance, when a "shock absorber 102" is used as the LCA, the shock will "always resist[ ] motion in either direction." (DeWitt Decl. Ex. 6 at 7.) Thus, as the wheel moves up, the spring and the "shock absorber 102" exert a ***combined*** force ***against*** the movement of the wheel. (Dkt. No. 85 Ex. N ¶ 19.) When the wheel moves back down, the spring and "shock absorber 102" still exert a ***combined*** force ***with*** the movement of the wheel, even though the shock absorber itself is exerting a force against the wheel's movement to dampen it. (*Id.*) RATO's construction, therefore, would exclude the shock absorber embodiment from the asserted claims.

RATO also argues that this claim term is indefinite. As explained above, the meaning of the term is easily discernible. The conclusory one-sentence opinion of RATO's expert does not provide clear and convincing evidence of indefiniteness. (*See* Ex. 6 at 6-7, *supra*, § I. D (citing indefiniteness cases).)

### F.    "positioning the spring of each independent suspension to bias a respective wheel of the two wheels in a downward direction, the spring having a range of compression between uncompressed and fully compressed states"

The parties dispute two aspects of this claim. *First*, RATO asserts that the term "always" should be included in the construction of the claim. *Second*, RATO asserts that the claim should include the phrase "permits the spring to move from uncompressed to fully compressed." Neither of these phrases should be added to the claim language.

It is unclear to Briggs what role the word "always" plays in RATO's proposed construction. The surrounding claim language and specification fail to provide any support for such an unnecessary limitation. The term "always" is neither found nor suggested anywhere in

the claims or specification.  The '678 patent teaches a suspension system that is meant to "minimize[] any rolling of the machine when a wheel passes over certain small bumps and depressions."  ('678 patent col. 4:52-53.)  A wheel follows a downward motion (relative to the frame) when it rolls into a depression in the ground and then follows an upward motion as it rolls out of the depression.  To the extent that RATO's ambiguous construction precludes this from happening, it should be rejected as contradictory to the teachings of the specification.

RATO's second proposed modification to the original claim language is not supported by the claims and is contrary to the intrinsic evidence.  The claims require "the spring having a range of compression between uncompressed and fully compressed states."  (*Id*. col. 11:39-41.)  In other words, it refers to a property of the spring and defines two states: fully compressed and uncompressed.  RATO, however, asserts that the suspension must "permit[ ] the spring to move from uncompressed to fully compressed."  This is contrary to the claims, which require that the LCA "prevent[s] full compression of the spring"—the claim cannot simultaneously permit the spring to move to a fully compressed state while preventing full compression of the spring.  The specification also identified the bottoming out of the spring as the problem to be solved by the claimed invention.  (*Id*. col. 2:35-37.)  RATO's construction, which permits the spring to be fully compressed, ignores the problem and solution identified in the specification.

### G.   "positioning the load compensation adjuster . . . inside a respective spring"

RATO contends that the phrase "inside a respective spring" means "entirely inside" the spring.  There is no basis for modifying the claim to add the word "entirely."  By compelling the inclusion of the LCA inside the spring, the '678 patent distinguishes "coil-over suspension," in which the LCA passes through the center of a coil spring, from a suspension where the spring and the LCA are side-by-side.  (*See* Dkt. No. 85 Ex. N ¶¶ 16-17; '678 patent col. 7:8-12.)

16

The parties' disagreement stems from whether the load compensation adjuster must be located ***partially*** or ***entirely*** within the spring.  In light of RATO's challenge, Briggs' proposes to clarify the plain meaning of the term, not to change it, by adding that "at least a portion" of the LCA is inside the spring.  Briggs' proposal is fully consistent with all of the claim terms and the specification.  Indeed, as Figure 16 depicts, for example, the "airbag 106" embodiment of the LCA is not entirely within spring 72.  ('678 patent col. 7:23-30, Fig. 16 ("Port 107" of the airbag is located outside of the spring).)  "Air shock 104" also has a "port 105" that extends outside the spring.  (*Id*. col. 7:19-21, Fig. 15.)  Indeed, even RATO's expert admits that the term "coil-over suspension," as used by the '678 patent when describing the shock absorber embodiment, immediately brings to mind a suspension unit with an LCA that is not entirely inside the spring.  (DeWitt Decl. Ex. 5 at 138:16-21.)  Contrary to RATO's suggestion, no language in the surrounding claims remotely suggests that the LCA must be located "entirely" within the spring.

RATO also argues that this claim term is indefinite.  As explained above, the meaning of this term is not only discernible, it is clear.  RATO's one-sentence contention in the joint claim construction statement is insufficient to establish indefiniteness.  (Dkt. No. 81-1 at 8; *see, supra*, § I.A (citing indefiniteness cases).)

## II.    DISPUTED CLAIM TERMS OF THE '746 PATENT

### A.    "a mower" / "a method of assembling a mower"

The preambles of independent claims 1 and 10 recite "a mower."  ('746 patent col. 35:54, col. 36:51.)  Briggs believes the "mower" preamble is limiting, while RATO contends that the word "mower" should be disregarded and that the '746 patent is directed to any type of vehicle.  RATO's position is clearly untenable.  The "mower" element provides critical antecedent basis to the claim, and is a fundamental characteristic of the claimed inventions.  It should be interpreted as limiting the claims.  *See Proveris Scientific Corp. v. Innovasystems, Inc.*, Nos.

17

2013-1166 *et al.*, 2014 WL 104025, at *4 (Fed. Cir. Jan. 13, 2014) (vacating and remanding

claim construction order because district court did not find preamble limiting); *Deere & Co. v.*

*Bush Hog, LLC*, 703 F.3d 1349, 1358 (Fed. Cir. 2012) (affirming finding that preamble term was

limiting because it described a "fundamental characteristic of the claimed invention").

     Every claim in the '746 patent includes the "mower" limitation in its preamble.  (*See* '746

patent col. 35:54-38:12.)  Both the patent's title and abstract expressly describe the claimed

invention as a suspension system and method for a "mower."  (*See id.* at p. 1)  All of the figures

depict either complete mowers or parts of a mower.  There is no description or figure describing

a vehicle other than a mower.  The specification of the '746 patent, moreover, shows that the

invention relates to a mower and not to any other vehicle.  The specification also provides that

every embodiment of the invention is a lawn mower:  "***a need exists for a lawn mower*** having a

suspension system that improves [the current problems with prior art lawn mowers] . . . .  ***Each***

***embodiment of the present invention provides one or more of these results***."  (*Id.* col. 2:61-3:4

(emphasis added).)  The Detailed Description also describes the invention as a mower.  (*See id.*

col. 9:12-13 ("***the mower of the present invention*** . . .") (emphasis added).)  The rest of the

specification exclusively refers to mowers as the inventions in the '746 patent.  (*See, e.g.*, *id.* col.

1:56-2:3, 3:61-67, 4:62-5:12, 5:44-6:15, 8:58-9:58, 10:65-11:3, 13:50-14:10, 14:33-59, 16:67-

17:2, 33:4-9, 35:30-52.)

     The prosecution history further confirms that the preamble is limiting.  In the PTO's

December 7, 2005 non-final rejection of the '746 patent's application, the examiner initially

rejected pending claim 19 as obvious over two pieces of prior art, Musgrave and Regier.  (Dkt.

No. 85 Ex. G at 6.)  In explaining his rejection, the examiner explained that Musgrave, which

patented a mower, allegedly contained "the claimed device except for the drive wheels the

spring, link system claimed." (*Id.*)  Accordingly, in view of Regier, the examiner articulated that a person of skill would know to combine Regier's "drive wheels of a mowing machine" with Musgrave.  (*Id.*)  The examiner clearly believed that that the '746 patent's preamble related to an essential function of the claimed invention—a mowing machine.

RATO's objection to treating the "mower" preamble as limiting is unavailing.  Indeed, for support, RATO merely cites to the use of the term "cutter deck" in the '746 patent's "claim language" and dependent claims 6 and 13.  (Dkt. No. 81-1 at 11.)  In reality, however, both claims only provides further support for the notion that the invention is a mower—as they both indicate *where* a cutter deck couples to the mower (the "main frame" for claim 6 and the "first and second wheels" for claim 13).  Accordingly, it is clear the term "mower" limits the claims.

### B.        "central longitudinal beam"

The parties have two fundamental disagreements relating to the term "central longitudinal beam."  *First*, the parties dispute the term "beam."  Briggs relies on the ordinary meaning of the claim language to define a "beam" as a "load bearing structure," while RATO contends that it denotes a "structural member of the frame."  *Second*, the parties dispute the term "central."  Briggs proposes that it means "centrally relative to the track width of the mower."  RATO proposes that it means positioning the "beam" at a "locat[ion] equal distances from the opposite sides of the frame."  Briggs' proposed construction more faithfully conforms to the claimed language in view of the intrinsic evidence.

To construe the term "beam," Briggs begins with the ordinary meaning of the term.  Robert Laurin, Briggs' R&D Manager, has testified that a "beam" is "a main structure which is used to support or basically to support members."  (Dkt. No. 58-1 Ex. H [Laurin Depo. Tr.] at 134:12-14.)  Mr. Laurin's understanding of a "beam" corresponds with contemporaneous dictionaries.  (*See*  Ex. 7 [Encarta Webster's English Dict.] at 3 (defining beam as a "horizontal

structural support").)  Nothing in the ordinary meaning of the term requires the word to be limited to a single piece of material.  Similarly, neither the specification nor the prosecution history prohibit a beam from being formed from multiple members.[4]

RATO's proposed construction attempts to import an unrecited limitation into the claims. RATO relies on an ambiguous passage in the specification that provides, *inter alia*, that a "beam" is "intended to encompass all [ ] structural members" disclosed in the '746 patent, including "bars, rods, non-tubular beams having any cross-sectional shape (*e.g.*, L-shapes, I-shapes, C-shapes, etc.), plates, and the like."  ('746 patent col. 26:43-58.)  This passage actually supports Briggs' construction because it describes what a beam is in broad terms.  "All structural members" includes singular member as well as built-up members.

As to "central," Briggs' construction is rooted in the express language of the claims and the specification.  Claim 1 gives context to the term "central" by requiring that the "first and second longitudinal pivot axes are "laterally spaced from the longitudinal axis between about 0% and about 20% of the track width."  ('746 patent col. 36:5-7; *see also id*. col. 4:41-47 (same disclosure of the location of the longitudinal beams), col. 4:51-62 (same) col. 5:49-59 (same).) The "track width," in turn, is defined by the specification as the distance between the front wheels of the front portion of the frame.  (*Id*. col. 4:38-41.)  Figures 37 and 38, which reveal two longitudinal beams that are substantially parallel at locations off of the exact center of the frame are centrally located relative to the perimeter of the track width.  (*Id*. col. 26:35-40 (disclosing

---

[4]  RATO cites to the prosecution history to argue that Briggs has disclaimed any construction of "central longitudinal beam" that includes a frame.  (*See* Dkt. No. 81-1 at 14, *see also* Dkt. No. 56-1 at 18-19.)  This argument is misplaced.  Briggs distinguished the Musgrave prior art to clarify that the beam in that reference formed the outside of the mower and, therefore, was not "central."  This distinction pertained only to the beam's location, not to its construction.  Briggs did not disavow the construction of a beam with multiple members.

two central longitudinal beams (676).)  By contrast, the specification provides no support to RATO's proposal to limit the location of the beam to the exact center of the frame.

In the alternative, RATO argues that the term "central longitudinal beam" is indefinite because neither the specification nor the claims provide any guidance as the location of the beam.  RATO fails to raise even a plausible argument for indefiniteness, because the meaning of "at least one central longitudinal beam" is discernible, and persons of ordinary skill in the art should be able to differentiate between a beam that is centrally located and one that is near the perimeter of the track width.  Claim 1 delineates the beam's location by placing the pivot axes between about 0% to about 20% of the track width, and Figures 37 and 38 provide additional guidance.  (*E.g.*, *id.* col. 4:41-62, 5:49-59, 26:35-40, 36:5-7, Figs. 37, 38.)

## C.    "substantially parallel"

The parties disagree whether the claim limitation "substantially parallel," present in each asserted claim, can be construed.  Briggs contends that "substantially parallel" should be afforded its plain meaning as understood by one of skill in the art, while RATO contends that the term is indefinite and therefore not amenable to construction.

Words of approximation such as "substantially," "generally" and "about" are ubiquitous in patent claims and are used to "avoid a strict numerical boundary to the specified parameter." *Ecolab, Inc. v. Envirochem, Inc.*, 264 F.3d 1358, 1367 (Fed. Cir. 2001).  Courts usually either decline to provide a further construction of such terms altogether or else replace one word of approximation with one or more synonyms.  *See Playtex Prods., Inc. v. Proctor & Gamble Co.*, 400 F.3d 901, 907 (Fed. Cir. 2005) ("substantially" given its ordinary meaning and no strict numerical boundary imposed); *Cordis Corp. v. Medtronic AVE, Inc.*, 339 F.3d 1352, 1360 (Fed. Cir. 2003) ("substantially uniform thickness" means "of largely or approximately uniform thickness"); *Anchor Wall Sys. v. Rockwood Retaining Walls, Inc.*, 340 F.3d 1298, 1311 (Fed. Cir.

21

2003) ("generally parallel" permits "some amount of deviation from exactly parallel"); *Streck, Inc. v. Research & Diagnostic Sys., Inc.*, 2008 WL4891132, at *8 (D. Neb. Nov. 12, 2008) ("A jury can be expected to understand that the word 'substantially' does not mean 'fully' or 'totally.'"); *Comair Rotron, Inc. v. Nippon Densan Corp.*, 154 F. Supp. 2d 326, 337-38 (D. Conn. 2001) ("substantial angular length" needs no construction).

Each asserted claim requires that "at least one central longitudinal beam" of the mower be "substantially parallel" with the mower's longitudinal axis.  (*See* '746 patent col. 35:53-38:18.)  This claim language already provides an understandable description of the positioning of a central structure within a mower.  The use of the word "substantially" is to accommodate insubstantial variations from a perfectly parallel arrangement, *e.g.*, fabrication processes.  (*See id*. col. 16:33-62.)  Given the natural variations from the manufacturing and design processes, "it will be appreciated by one having ordinary skill in the art that various changes in the elements and their configuration and arrangement are possible without departing from the spirit and scope of the present invention as set forth in the appended claims."  (*See id*. col. 35:47-52.)

RATO alleges that the term "substantially parallel" is indefinite and not amenable to construction by the court.  "Substantially parallel" is not ambiguous and should be afforded its ordinary meaning.  As the cited caselaw above demonstrates, the presence of such terms neither obligates the court to define a precise boundary, nor necessarily renders the claim indefinite.  RATO has failed to provide clear and convincing evidence of indefiniteness.

### D.     "pivotably coupled to the at least one central longitudinal beam"

Claims 1 and 10 recite a mower having front wheels that are "pivotably coupled" to the "at least one central longitudinal beam."  ('746 patent col. 35:63-36:7, 36:65-37:5.)  The dispute between the parties relates to RATO's proposal to narrow the ordinary understanding of the

claimed language to require that the first and second wheels (i) connect ***directly*** to, and (ii) pivot about, "the ***same***" central longitudinal beam.

Briggs has already explained above why the term "coupled" is not limited to a direct connection.  (*See, supra*, § I.B.2.)  RATO's attempt to require the coupling of wheels to "the same central longitudinal beam" should also be rejected, construction is contradicted by the claims, which expressly provide that the wheels are pivotally coupled to the "***at least one*** central longitudinal beam."  (*See* '746 patent col. 35:63-36:3, 36:65-67.)  RATO's proposed construction omits the words "at least one" from the asserted claims.  There is no requirement that both wheels be coupled to the same beam.  All that is required is for the wheels to be coupled to the collection of beams that is the "at least one central longitudinal beam."  Because RATO's construction ignores important claim language, it should be rejected.

### E.    "laterally spaced from the longitudinal axis between about 0% and about 20% of the track width"

The parties disagree whether the claim limitation "laterally spaced from the longitudinal axis between about 0% and about 20% of the track width" in each asserted claim can be construed.  The claim term is not ambiguous and it should be afforded its plain meaning.  RATO contends that the term is indefinite and therefore not amenable to construction.  If the court correctly determines that "laterally spaced from the longitudinal axis between about 0% and about 20% of the track width" is not indefinite, then RATO agrees with all of Briggs' construction except RATO would omit the word "about" from the claim, which is improper.

Just like the term "substantially parallel" discussed above, the use of "about" in the present disputed claim term does not render it indefinite.  Courts routinely construe terms with such words of approximation according to their plan meaning.  (*See, supra*, § II.C (citing cases).)  The specification clearly teaches one of ordinary skill in the art how to determine whether the

mower's pivot axes are about 0% to 20% from the track width.  (*E.g.,* '746 patent col. 29:5-12.)

Because this claim element can be readily construed, RATO fails to establish indefiniteness.

RATO's alternative construction of this claim term would remove "about" from the claim.  This

is contrary to the claim language and should be rejected.  *See Bicon*, 441 F.3d at 950.

### F.    "first and second transverse portions"

Claim 3 and its dependents include first and second suspension arms with "first and

second transverse portions disposed respectively on opposite end of the suspension arm, and a

longitudinal portion coupling the first and second transverse portions."  ('746 patent col. 36:14-

18.)  Briggs and RATO disagree whether the "first and second transverse portions" of each

suspension arm must extend "substantially" (Briggs) or exactly (RATO) at a right angle.  The

parties also diverge as to whether a "transverse portion" must be of a certain length.

The claim language does not provide that the transverse portions must be oriented at a

"right angle."  Instead, they are identified as the portions that extend away from the mower, as

shown, for example, in Figure 20 where portions 151a and 151b are not at an exact right angle to

the mower frame – they are substantially at a right angle.  (*Id*. col. 12:37-64, Fig. 20.)  Figures 37

and 38 also show examples of suspension arms with transverse portions that extend substantially,

but not exactly, at a right angle to the mower.  (*Id*. Figs. 37, 38.)  RATO's proposal to require a

transverse portion be of "substantial length[]" and only at a "right angle (or 90 degrees)" is not

supported by the intrinsic evidence and should not be imported into the claim.  *See Douglas*

*Dynamics,* 717 F.3d at 1342.

### G.    "longitudinal portion"

The parties' dispute regarding this claim element resembles its dispute about "transverse

portions."  Here, the parties disagree whether the longitudinal portion must be "substantially

parallel" (Briggs) or "parallel" (RATO).  Further, the parties disagree whether the longitudinal

portion is a "portion" (Briggs) or a "substantial portion" (RATO) of each suspension arm.

Claim 3 and its dependents include a "longitudinal portion coupling the first and second

transverse portions."  ('746 patent col. 6:16-17.)  The claim language, however, contains neither

of RATO's proposed limitations.  *First*, contrary to RATO's proposal, there is no evidence that

the patentee's even contemplated limiting the claim term only to exactly parallel arrangements.

The '746 patent provides that "it will be appreciated by one having ordinary skill in the art that

various changes in the elements and their configuration and arrangement are possible without

departing from the spirit and scope of the present invention as set forth in the appended claims."

(*See id.* col. 35:47-52.)  Such changes include longitudinal portions that are substantially, rather

than perfectly, parallel to the frame.  *Second*, RATO's proposed requirement that a longitudinal

portion be of a "substantial length" is also not supported by the claims or the intrinsic evidence.

*Finally*, RATO's proposed construction ignores the inherent curve between the longitudinal

portion and the first and second transverse portions showed in Figures 20, 37 and 38.  (*See id.*

Figs. 20, 37, 38.)

## CONCLUSION

For the foregoing reasons, Briggs' requests that the Court adopt Briggs' proposed

constructions of the disputed claim terms.

Dated: January 30, 2014

BOND, SCHOENECK & KING, PLLC

By: /s/ Edward R. Conan
Edward R. Conan (101387)
Lucy S. Clippinger (518040)
One Lincoln Center
Syracuse, NY 13202
Telephone: (315) 218-8000

- and -

ARNOLD & PORTER LLP
Matthew M. Wolf (*pro hac vice*)
Marc A. Cohn (*pro hac vice*)
Amy L. DeWitt (*pro hac vice*)
Seth Heller (*pro hac vice*)
555 Twelfth Street, NW
Washington, DC 20004-1206
Telephone: (202) 942-5000

Attorneys for Plaintiffs